UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2010-211 (WOB-CJS)

CHRISTOPHER ROBISON                              PLAINTIFF

VS.                        MEMORANDUM OPINION

TRACY WATSON, ET AL.                             DEFENDANTS


        The Court previously having granted defendants'
motions for summary judgment (Doc. 68), it now issues the
following Memorandum Opinion setting forth its reasons for
those rulings.

### Factual and Procedural Background

**A.    The Underlying Incident**

        Plaintiff Christopher Robison and defendant Sharon
Robison were married from 2001 to 2008, and they have a son
and a daughter together.  After they divorced, the Robisons
shared custody of their children.

        The Robison children[1] -- the daughter then age 8 and
the son age 5 -- were in the care of their father from
Wednesday, June 30, 2010 to Sunday, July 4, 2010.  On July
4, plaintiff instructed his son to clean his room and, when
the boy failed to do so, plaintiff "cracked his butt" three

_____
[1] The children being minors, their names are not used in this opinion.

times with a belt.

Later in the day, plaintiff and the children were outside playing hopscotch.  Plaintiff's son was having difficulty keeping his balance and stated that he was going to quit, so plaintiff instructed the children to practice their balance by hopping on one foot to and from the far side of their cul-de-sac.  Plaintiff's son, who repeatedly lost his balance, complained that he did not want to continue and went inside to get a drink of water.  When he did not return, plaintiff went inside the house and brought him outside, instructing him to continue the hopping exercise.

When plaintiff's son told plaintiff that he "could not make him" hop, plaintiff threatened to "bust his butt" again.  When his son continued with this statement, plaintiff took him inside, had him put his hands on the kitchen counter, and struck him twice with a belt. Plaintiff testified that his son "grabbed his butt and he danced and he had a painful look." (Plf. Depo. 153).

The next morning, the children returned to defendant Robison's house.  While bathing her son that evening, defendant Robison noticed bruises on his buttocks and upper right thigh.  She asked her son how he got the bruises, and he replied that his father had spanked him.  Both children

2

told her that their father had called the son a quitter and

spanked him for failing to perform the hopping exercise.

Heated exchanges then occurred between defendant

Robison and plaintiff, including a telephone call in which

plaintiff left the following message:

> I am calling about the accusations that I abused
> [our son].  I love [him] and I am not interested
> in leaving bruises on him.  I cracked his butt
> because he refused to do something I told him he
> need[ed] to finish . . . .  From this point on,
> I'm not going to use a belt on him.  If I crack
> him it will be with my hand but not to leave a
> mark. . . .  I am not interested in leaving a
> mark on [him] because I love him. . . . .  If I
> use my hand, I'll crack him on the butt in a way
> that's not going to leave a mark but is going to
> get the point him with him.

(Doc. 40-1 at 3)

On July 6, defendant Robison called her son's

pediatrician, Dr. Janning, and related what had transpired.

Dr. Janning suggested that defendant Robison take her son

to the Mayerson Center, a part of Cincinnati Children's

Hospital that handles cases of suspected child abuse.

Defendant Robison made an appointment for her son later

that day.

The Mayerson Center physicians examined the boy and

took color photographs of the bruising they observed.  The

boy and defendant Robison were then interviewed by a social

worker, Emily Detrick.  Detrick wrote in her report that

the boy told her that plaintiff had spanked him with a belt because he could not hop on one foot long enough; that plaintiff had spanked him with a belt on other occasions; and that he felt safe at his mother's house but not at his father's house.  Detrick wrote that "this history is consistent with physical abuse and is very concerning."

Another physician, Dr. Kathi Makaroff, also examined the boy and observed that the pattern of bruising was "concerning" for "probable" abuse.

The following day, Mayerson social worker Cecilia Freihofer interviewed the parties' daughter, who stated that she had seen what happened and that her brother got the bruises from having his "butt busted" by plaintiff because he could not hop as his father instructed.  The daughter also stated that plaintiff used a belt folded in the middle and that when plaintiff spanked her, he told her not to tell her mother.

The Mayerson Center reported these concerns to the Kentucky Cabinet for Families and Children ("CFC") which, in turn, contacted the Boone County Sheriff's Department.

**B.  The Criminal Investigation**

On July 9, 2012, defendant Tracy Watson, a Boone County Sheriff's Detective, was assigned to investigate the

4

Robison case.[2]  Watson reviewed the reports from the
Mayerson Center, and she and a CFC employee, Summer Neckel,
met with defendant Robison and the two children.  Robison
explained how she had discovered the bruises on her son and
related her ensuing conversations with plaintiff.  (Doc.
40-1 at 2).  Watson also reviewed the telephone message,
quoted above, that plaintiff left for defendant Robison.
Defendant Robison also told Watson of overly harsh
discipline that plaintiff had used with her older children
while she and plaintiff were married.

     Watson interviewed the son and daughter, who related
to her the same incidents they had described at the
Mayerson Center regarding the spankings by their father and
specifically the July 4 "hopscotch" incident.  She also
interviewed defendant Robison's two older children
regarding plaintiff's treatment and discipline of them.

     On July 12, 2012, Watson, Neckel, and Detective Matt
Mullins interviewed plaintiff at his house.  Watson
explained to plaintiff that they were investigating a
concern regarding bruising found on his son after the July
4 visit.  (Doc. 40-1 at 6).  Plaintiff first said that his
son may have been bruised when he scraped the side of the

_____

[2] Watson's report notes that she was familiar with plaintiff due to a
prior report of possible abuse by plaintiff against defendant Robison's
older children from a previous marriage.  (Doc. 40-1 at 2).

pool while swimming, but he continued to describe the
hopscotch exercise with the children and his discipline
"philosophy."  Given the claims and defenses in this case,
Watson's notes are quoted at length:

> ROBISON said that on Sunday, July 4[th], he was outside
> with the kids teaching them to play hopscotch and they
> did not have good balance so he was "training them"
> with an exercise of hopping around the cul-de-sac to
> the stop sign.  He said Ava did it with no problem,
> but Aden kept putting his foot down.  He said that the
> first time he took Aden inside, he just talked to him
> about not quitting, but then they went outside and
> Aden still couldn't hop good on one leg.  He said that
> Aden told him he couldn't do it and that was why he
> took him inside the house where he had him hold onto
> the kitchen counter and he spanked him with the belt
> he was currently wearing.  It was a black belt as Aden
> said.  ROBISON said that he held the belt and spanked
> him on the butt a couple of times and told him he
> wasn't going to raise a kid that was a quitter.  He
> said he doesn't think the belt would have hit Aden in
> the thigh and that he wasn't angry when he spanked
> him.  ROBISON said he is very calculated when he
> disciplines his kids and wants to get his point
> across.  He said that he didn't plan on causing the
> bruises when he spanked him and he said that it didn't
> make sense for him to want to leave bruises because
> Aden could not see them on the back of his thigh and
> therefore, it would not add any effect to his
> discipline.  He said he knew exactly how to fold the
> belt so that he hits the buttocks.  He said he is very
> regimented when it comes to training and discipline
> and every action he takes is for a reason.  This
> detective showed ROBISON the pictures of Aden's
> buttocks and the bruises and he said that he didn't
> think he caused all of that.  He said that maybe there
> was already a bruise there and he might have added to
> it, but he didn't think it was fair that he be blamed
> for all of the bruising.  He said that he looked at
> Aden's butt that night and the bruising didn't seem
> bad at all and that Aden sat on his shoulders and
> watched some fireworks later that night and didn't
> complain about his butt hurting.

6

ROBISON said that he is a strict disciplinarian and that he has to work extra hard when the kids come to his house from their mom's because he is a stiffer parent.  He said there is no discipline at her house and she lets them run wild.  He said that he believes that his kids have to realize that their dad will outlast their stubbornness.  ROBISON said that he believes in training his kids correctly and gave examples of how, when Ava was younger, he used to make Ava recolor her pictures because she needed to color within the lines.  Now, at 8 years old, she is a good artist and he doesn't have to correct her much at all. He said sometimes she has to fix the eyes on her drawings because she doesn't make them symmetrical. He also said that he was working with Ava on how to dive off the diving board and that he worked with her by having her jump over and over off the side of the pool while he was teaching her to get her form right for diving.  He said that he then made her go off the diving board multiple times, so that she could do it correctly.  He also said that he makes Aden swim back and forth in the deep end because he always wants to stay in the shallow end and is afraid to swim in the deep end.  ROBISON said that he stays close to him so there is no danger of him drowning.  He said that he trains them for whatever they are doing so they succeed in it.  He said that he is teaching both of them how to play baseball.  They have to catch the ball with the glove in the correct position or he makes then do it over again.  ROBISON said that he was a coach for years to teens and he knows that balance is very important.  He has a balance beam in his basement that they walk on to help get better balance. He said it is not like he makes Ava do it 20 or 30 times, but she has to walk across it until she can do it without losing her balance.

ROBISON said that he has spanked the kids recently for fighting with each other, but that he didn't leave any bruises.  He also admitted that he spanked Ava one time with his backscratcher because he didn't feel like taking off his belt.  He didn't see a problem with that and it didn't make her afraid of it because she still uses it to scratch her back.  This detective asked him if he reacted now with his 5 year old because of the hopscotch incident, how he was going to

react when the kids were teenagers and talked back.
ROBISON said that his philosophy was that if you are
very strict with discipline between the ages of 3 and
8, you will not have those issues when they are
teenagers.  He said that his kids love him and that
they are supposed to be afraid of being disciplined by
him.

ROBISON said that he had decided after hearing about
the bruises from his ex-wife, that he would find other
means of discipline.  He said that he had no problems
with corporal punishment, but he did not want to give
his ex-wife anything to cause him trouble over.

(Doc. 40-1 at 6-7).

After a further exchange regarding prior complaints

involving defendant Robison's older daughter and a consent

search of plaintiff's computer, Watson told plaintiff that

"the prosecutor's office would look at the case and

determine if charges were going to be filed."  (Doc. 40-1

at 8).

Watson presented the information gathered during her

investigation to the County Attorney, who determined that

there was sufficient probable cause to arrest plaintiff for

Criminal Abuse in the First Degree pursuant to KRS 508.100.

Watson then signed an affidavit (Doc. 40-10), which she

presented to District Court Judge Linda Bramlage, and Judge

Bramlage issued a warrant for plaintiff's arrest.

Plaintiff turned himself in that afternoon, posted

bail, and was released.

At some point that day, Watson spoke to Boone County

8

Spokesman for Public Information Services, Tom Scheben, who

issued a press release dated the same day, which stated:

> On Monday, July 12, 2010 at approximately 4:30 p.m. a Union, Kentucky man was arrested for abusing his 5 year old son, an incident that occurred on July 4, 2010 at approximately 3:00 p.m. at the man's home.
>
> Christopher Robinson, 46 of Union, Kentucky was charged with Criminal Abuse 1st degree (Class C felony) after investigators learned he beat his son with a belt causing severe bruising because the boy was not playing hopscotch to his satisfaction.
>
> Robison turned himself in to detectives this afternoon, posted a $500.00 bond and was released. A Class C felony is punishable by 5 – 10 years in the state penitentiary.

(Doc. 40-11).

A preliminary hearing was held before Boone County

District Judge Michael Collins on August 23, 2012. (Doc.

54, Transcript). The judge found a lack of probable cause

that plaintiff intentionally abused his son as required for

the charged felony and thus dismissed that charge. (Doc.

54 at 14-15). However, the judge observed that "it's

obvious there was some abuse," that the "abuse was

excessive," and that plaintiff "could have been handled

probably as a misdemeanor." (Id. at 14).

C.    **This Litigation**

Plaintiff filed this action on September 29, 2010,

against Watson, defendant Robison, and Boone County

Prosecutor Linda Talley Smith.  (Doc. 1).  Plaintiff
thereafter voluntarily dismissed Smith.  (Docs. 12, 14).

Following discovery, defendants filed motions for
summary judgment which were fully briefed and argued to the
Court.  (Doc. 68)

### *Analysis*

A.   **Defendant Watson**

   1.   **Unlawful Arrest**

"In order for a wrongful arrest claim to succeed under
§ 1983, a plaintiff must prove that the police lacked
probable cause."  *Everson v. Leis*, 556 F.3d 484, 498 (6th
Cir. 2009) (quotation omitted).  "A police officer has
probable cause only when he discovers reasonably reliable
information that the suspect has committed a crime."  *Id.*
In obtaining such reliable information, "an officer cannot
look only at the evidence of guilt while ignoring all
exculpatory evidence."  *Id.*  Instead, the officer must
consider the totality of the circumstances, "recognizing
both the inculpatory *and* exculpatory evidence, before
determining if he has probable cause to make an arrest."
*Id.* (emphasis in original).

In determining whether an officer had probable cause
to make an arrest, the court examines the totality of the
circumstances and may consider only the information

10

possessed by the arresting officer at the time of the arrest. *Id.* (citation omitted). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that it required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.* at 499.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* (citation omitted). But under § 1983, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Id.*

Here, Watson arrested plaintiff for the offense of criminal abuse in the first degree:

A person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby:

> (a) Causes serious physical injury; or
> (b) Places him in a situation that may cause him serious physical injury; or
> (c) Causes torture, cruel confinement or cruel

11

punishment;

to a person twelve (12) years of age or less, or who
is physically helpless or mentally helpless.

KRS 508.100.  "Abuse" is defined to include "the infliction
of physical pain, injury, or mental injury."  KRS 508.090.

Even construing the evidence in plaintiff's favor, the
Court concludes that defendant Watson had probable cause to
arrest plaintiff for this offense and, in the alternative,
that she is entitled to qualified immunity.

It is undisputed that when Watson concluded her
investigation, she knew that:

- Plaintiff's son and daughter told the social workers
  and Detective Watson that plaintiff spanked the boy
  because he was not hopping according to plaintiff's
  wishes;

- Plaintiff's son, daughter, and ex-wife reported
  plaintiff had a history of spanking his young children
  with belts;

- The boy had bruising in the area where he was spanked,
  which doctors deemed to be concerning and suspicious
  of possible abuse;

- Plaintiff admitted that he had hit his young son with
  a belt on that and on other occasions to punish him
  for misbehavior; and

- Plaintiff admitted that he "cracked" his boy several
  times on July 4, 2010, even though he opined that the
  bruises could have resulted from the boy's fall in the
  pool earlier that weekend.

Thus, it was undisputed that plaintiff intentionally
struck his son with a belt, resulting in objectively-

verified physical injury.  A reasonable officer having this information from the victim and medical professionals could thus reasonably conclude that plaintiff committed the above offense.

Secondly, an "arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (citation omitted).  An exception exists, however, where the arresting officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and such statements or omissions were "material" or "necessary" to the finding of probable cause.  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citations omitted).

It is not disputed that Watson arrested plaintiff based on a warrant issued by Boone District Court Judge Linda Bramlage.  (Doc. 40-10).  Plaintiff argues nonetheless that Watson recklessly made false statements and omitted information in her affidavit that supported the warrant.  Specifically, plaintiff argues that Watson failed to note that: (1) plaintiff's ex-wife did not discover the bruising right away; (2) the daughter told the Mayerson doctors that she had never seen her father's spanking cause

13

bruises on her brother; (3) plaintiff and his ex-wife had
an acrimonious relationship; and (4) plaintiff phoned his
wife and told her that he "cracked" the boy for refusing to
do something and that he was not interested in leaving
bruises on the child.  *See* Doc. 55 at 16-17, 18-19.

This argument does not change the probable cause
analysis because, even assuming Watson's affidavit omitted
the cited information, Judge Bramlage issued the warrant
based upon the fact that plaintiff hit his son with a belt
more than once, resulting in severe bruising.  For the
reasons just discussed, this is sufficient to constitute
probable cause under the law of Kentucky at the time the
warrant issued.  *See Canler v. Commonwealth*, 870 S.W.2d 219
(Ky. 1994).

Finally, an "officer is entitled to qualified immunity
when probable cause supports the suspect's arrest on some
offense, even if it is not the offense of arrest." *Burden
v. Paul*, No. 11-6278, 2012 WL 3216453, at *3 (6th Cir. Aug.
8, 2012) (citation omitted).  Judge Collins observed during
plaintiff's preliminary hearing that "it's obvious there
was some abuse," that the "abuse was excessive," and that
plaintiff "could have been handled probably as a

14

misdemeanor."[3] (Doc. 54 at 14-15).  Thus, Watson would have

had probable cause to arrest plaintiff for a related

offense, and this is a separate basis entitling her to

summary judgment on the unlawful arrest claim.

### 2.   Malicious Prosecution

An individual may be liable under § 1983 for malicious

prosecution if he wrongfully institutes legal process

against another individual.  *Sykes v. Anderson*, 625 F.3d

294, 308 (6th Cir. 2010).   In order to make out a

malicious prosecution claim, a plaintiff must demonstrate

that: (1) the defendant participated in the decision to

prosecute the plaintiff, (2) probable cause did not support

the institution of legal process, (3) the plaintiff

suffered a Fourth Amendment deprivation of liberty in

addition to the initial seizure as a result of the

institution of proceedings, and (4) the legal proceedings

were resolved in the plaintiff's favor.  *Id.* at 308-09.  A

plaintiff need not show that the person who instituted

proceedings acted maliciously to make out this claim.  *Id.*

at 309-10.

Plaintiff's federal malicious prosecution claim fails

as a matter of law for at least two reasons.  First, as

---

[3] Criminal abuse in the third degree pursuant to KRS 508.120 is a Class A
misdemeanor.

already explained, plaintiff's prosecution was supported by
probable cause.

Second, no reasonable jury could find that Watson was
responsible for the institution of criminal proceedings
against plaintiff.  In the Sixth Circuit, it "is absolutely
clear . . . that an officer will not be deemed to have
commenced a criminal proceeding against a person when the
claim is predicated on the mere fact that the officer
turned over to the prosecution the officer's *truthful*
materials."  *Sykes*, 625 F.3d at 314 (citations omitted).
To circumvent this rule, plaintiff must show that the
officer (1) stated a deliberate falsehood or showed
reckless disregard for the truth at the hearing, and (2)
that the allegedly false or omitted information was
material to the court's finding of probable cause.  *Id.* at
312.

Plaintiff makes the conclusory assertion that he has
satisfied this element of his federal malicious prosecution
claim, but he points to no record evidence which supports
it.  (Doc. 55 at 19-20).  The mere fact that Watson was the
sole investigator on the charges against plaintiff, that
she signed the complaint and citation, and that she felt
that the charges "fit" the situation does not take this
case outside the rule set forth in *Sykes*.  The absence of

16

any allegedly untruthful statement or material omission by Watson is thus fatal to this claim.

### 3. State Law Claims

As the Court stated at oral argument, it will exercise its discretion to dispose of plaintiff's state law claims in this matter. *See* 28 U.S.C. §§ 1367(a), (c).

### a. Intentional Infliction of Emotional Distress

Under Kentucky law, when damages for emotional distress are available through a traditional state tort claim, and the conduct was not intended only to cause extreme emotional distress, a claim for the tort of intentional infliction of emotional distress ("outrage") will not lie. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993).

In *Rigazio*, the court held that the plaintiff, who had been sexually abused by a priest, could not recover against the priest for outrage because plaintiff could recover damages for emotional distress as part of his claims for common law assault and battery, which he had pled. The court stated:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filler" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 [of the Restatement (Second) of Torts] recognizes that where

> an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.  Recovery for emotional distress in those instances must be had under the appropriate traditional common law action.  The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

*Id.* at 298-99.

Plaintiff's reliance on *Brewer v. Hillard*, 15 S.W.3d 1 (Ky. App. 1999), to overcome the *Rigazio* rule is unavailing.  In *Brewer*, the court held that the plaintiff could maintain a claim for outrage based on allegations that the defendant subjected him to explicit and offensive same-sex verbal harassment.  Based on the nature of the harassment, the court concluded that a jury could find that the defendant's sole intent was to harm plaintiff emotionally; indeed, the defendant testified that he did *not* take any of the actions for sexual gratification.  *Id.* at 8.

Here, however, plaintiff has pled traditional tort claims for defamation and invasion of privacy, both of which allow for the recovery of compensatory damages. *Rigazio* thus controls.

Moreover, plaintiff has adduced no evidence that Watson  acted with the sole intent to cause plaintiff

emotional harm.

Defendant Watson is thus entitled to summary judgment on this cause of action.

### b.  Defamation

An action for defamation under Kentucky law comprises four elements: (1) defamatory language; (2) about the plaintiff; (3) which is published by the defendant; and (4) which causes injury to reputation. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981).

KRS 411.060 provides a qualified privilege against a libel claim for one who publishes "a fair and impartial report or the whole or a synopsis of any indictment, warrant, affidavit, pleading or other document in any criminal or civil action in any court of competent jurisdiction." *See generally Trover v. Kluger*, Civil Action No. 4:05CV-014-H, 2007 WL 528419, at *7-*8 (W.D. Ky. Feb. 14, 2007).

Given these parameters, plaintiff's claim for defamation fails as a matter of law.  First, defendant Watson did not publish the press release of which plaintiff complains.  Rather, it is undisputed that the Boone County Sheriff's Department spokesman, Tom Scheben, published the release to the press.  (Doc. 40-11; Scheben Depo. at 7-8).

Second, the release falls within the privilege of KRS

411.060 because it merely recites facts taken from the criminal record of the proceedings against, including phrases quoting verbatim from the Criminal Complaint.

### c.   Invasion of Privacy

Plaintiff's claim against defendant Watson for "false light" invasion of privacy based upon the press release also fails at the summary judgment stage.  As noted, there is no evidence that Watson had any role in publishing that statement to the press.

Moreover, to the extent that plaintiff complains that the release was "false" because it stated that plaintiff struck his son for failure to play hopscotch "to plaintiff's satisfaction," it is undisputed that Watson was told as much by plaintiff's son and daughter, and that the same information was reflected in the materials Watson reviewed from the Mayerson Center.  Thus, even if the release could be attributed to Watson, no reasonable person could find that she knew the statements therein to be false or made with reckless disregard.  *See generally McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 888 (Ky. 1981).

B.   **Defendant Robison**

1.   **Malicious Prosecution**

"The failure of plaintiff's federal claim of malicious prosecution defeats [his] analogous state law claim." *Burden*, 2012 WL 3216453, at *5.  As already discussed, probable cause existed for plaintiff's prosecution.

Moreover, there is a complete absence of evidence that the institution of criminal charges against plaintiff was "by or at the insistence of" defendant Robison.  *Id.* (citation omitted).  Instead, defendant Robison – whatever acrimony existed between her and plaintiff – merely took her son to the Mayerson Center as suggested by the boy's pediatrician.   It was the medical professionals who contacted state officials who, in turn, reported the matter to the Boone County Sheriff's Department.

This claim thus also fails as a matter of law.

2.   **Intentional Infliction of Emotional Distress**

Plaintiff's claim against defendant Robison fails for the same reasons already discussed with respect to defendant Watson.

3.   **Defamation**

Plaintiff's claim for defamation against defendant Robison fails for the basic reason that he has identified no false statement made by her.  In his response brief,

21

plaintiff devotes a single paragraph to this fundamental issue, stating only that defendant Robison discussed with her sister, mother, and co-workers the fact that (1) her son had suffered bruising, and (2) plaintiff was being charged with child abuse.  (Doc. 56 at 12).  As is obvious from the record, both of these statements are, in substance, true.

Instead, plaintiff devotes the bulk of his brief to discussing defendant Robison's allegedly malicious state of mind.  Even if true, however, this does not create a triable issue where plaintiff fails to adduce evidence of the most basic element of a defamation claim, a false statement.

### 4.   Invasion of Privacy

Plaintiff's final claim against defendant Robison, invasion of privacy, may be established under four separate theories: (1) unreasonable intrusion upon the seclusion of another; or (2) appropriation of the other's name or likeness; or (3) unreasonable publicity given to the other's private life; or (4) publicity that unreasonably places the other in a false light before the public. *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981) (citation omitted).

Although plaintiff recites as a basis for this claim

22

all but the second of the above prongs, the only
substantive argument he makes is that defendant Robison's
"mischaracterization of, and reaction to" the facts
concerning the July 4, 2010 incident placed him in a false
light.  (Doc. 56 at 15-16).

This argument suffers from at least two fatal flaws.
First, unlike the other prongs of this tort, false light
invasion of privacy requires that the publicized matter
actually be false.  *McCall*, 623 S.W.2d at 887 (citation
omitted).  *See also Hays v. Clear Channel Commc'ns*, No.
2005-CA-001490-MR, 2006 WL 3109132, at *5 (Ky. App. Nov. 3,
2006) ("The requirement that the plaintiff be placed in a
false light necessarily requires that the defendant alleged
or implied facts about the plaintiff which are not true.").
Defendant Robison reported to her son's physician that the
boy had bruises on his body which she discovered after he
said that he had been spanked by his father.  It is
undisputed that these statements are true.

Second, and also quite fundamentally, the "false
light" publicity of which plaintiff complains resulted, not
from defendant Robison's report to the doctors, but from
their subsequent report to the Boone County authorities and
the Sheriff's Department's ensuing statement to the press.
There is no evidence that defendant Robison made any

23

communication to the public at large regarding this matter, as required for this tort. *See* David A. Elder, *Kentucky Tort Law: Defamation and the Right of Privacy* 435-36 (1983). *See also Stewart v. Pantry, Inc.*, 715 F. Supp. 1361, 1369 (W.D. Ky. 1988) (noting that "the false public image must result from an unreasonable *publicity* by the *defendant*").

Summary judgment is thus also appropriate on this claim.

A separate judgment shall enter concurrently herewith.

This 19th day of September, 2012.



Signed By:

**William O. Bertelsman**

**United States District Judge**